GERSETA CORPORATION, Respondent, Appellant, *v.* THE EQUITABLE TRUST COMPANY OF NEW YORK, Defendant, Impleaded with the RAW SILK TRADING COMPANY and Others, Appellants, Respondents.

First Department, February 6, 1925.

Subrogation — plaintiff purchased silk from trading company — trading company purchased silk from another and established letter of credit in defendant bank pledging collateral to bank — silk was delivered by bank to trading company under trust receipts and delivered by latter to plaintiff — bank recovered judgment against plaintiff — trading company was indebted to plaintiff at time of settlement of judgment recovered by bank — plaintiff not subrogated to bank's right in collateral — plaintiff was primarily liable for debt to bank — rights of creditors of trading company, now insolvent, have intervened — no unjust enrichment of trading company's estate at expense of plaintiff — plaintiff could not compel bank to first exhaust collateral security — securities were not pledged to pay same debt — agreement settling judgment by bank against plaintiff does not establish right of subrogation — stocks turned over by individual defendant to trading company and pledged to bank passed to trading company and said defendant has no interest.

The plaintiff which purchased silk from a trading company which, in turn, purchased silk from another, and established two letters of credit with the defendant bank, secured in part by corporate stock belonging to the trading company, for the purpose of paying for the silk so purchased, is not, on being compelled in an action by the bank to pay for the silk delivered to it subrogated to the rights of the bank in the collateral pledged by the trading company with the bank, although the trading company is indebted to the plaintiff, since it appears that the silk was delivered to the bank, which, in turn, delivered it to the trading company under trust receipts; that the trading company delivered the silk to the plaintiff under invoices which corresponded as to dates with the trust receipts; that the plaintiff refused to pay for the silk and the bank recovered judgment against it, which judgment was settled by the payment of a part thereof under an agreement that the bank would apply that sum on the debt owing it by the trading company, and that the trading company would reduce the amount of the debt owing it by the plaintiff; that at about the time the bank

began its action, or shortly thereafter, the trading company became financially embarrassed and its business was taken over by a creditors' committee, and that at about that time the trading company was indebted to the plaintiff for a sum in excess of that which the plaintiff owed for the silk purchased by it from the trading company.

The plaintiff was primarily liable for the debt which it paid to the bank, and in making payment it simply discharged its own obligation and this is none the less true because the bank took the plaintiff's obligation to secure repayment of advances made on the account of the trading company, or because the bank never sought to enforce plaintiff's obligation in an amount greater than such advances.

The obligation of the plaintiff did not cease to be primarily its own because it had been assigned by the trading company to secure a debt owing by it to the bank, and in no sense can it be said that the plaintiff, in paying the bank, was satisfying the obligation of the trading company.

Moreover, the rights of the creditors of the trading company who are entitled to its assets have intervened and the plaintiff cannot claim relief on the ground that there was an unjust enrichment of the estate of the trading company as the result of the payment by the plaintiff to the bank.

The plaintiff had no right to require the bank to first exhaust the collateral security held by it against the payment of the amount advanced on the letters of credit, for such credit was not given or received directly or indirectly to protect the plaintiff in any way whatsoever.

The securities so deposited with the bank were not pledged to secure payment of the same debt, for the plaintiff's obligation was to pay the price of the goods under its contract with the trading company, while the debt of the trading company on the other hand was for advances which had been made to it by the bank.

The agreement settling the judgment against the plaintiff in favor of the bank expressly left open the question whether plaintiff was entitled to subrogation, and it did not establish that it was so entitled.

The claim by the individual defendant that he is entitled to the pledged stock, subordinate only to the rights of the bank, cannot be sustained, since the evidence establishes that the individual defendant transferred the stock in question to the trading company under an agreement which is clear and unambiguous and which was prepared by his own attorney, whereby he received capital stock of the trading company, and an agreement to employ him and others for a period of three years. Under such circumstances, it is clear that the title of the individual defendant to the stock transferred to the trading company and subsequently pledged, passed absolutely to the trading company.

APPEAL by the defendants, the Raw Silk Trading Company and others, from the judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 11th day of February, 1924, upon the decision of the court rendered after trial at the New York Special Term.

Appeal by the plaintiff, Gerseta Corporation, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 26th day of February, 1924, denying the plaintiff's motion for an extra allowance.

The judgment appealed from subrogated plaintiff to the rights of the Equitable Trust Company in 375 shares of the Singer Manufacturing Company stock in the possession of the Equitable Trust Company, and directed the sale of the stock and payment to plaintiff of the sum of $37,290 from the proceeds thereof. The defendants Foster assert a right to the stock prior and superior to the right of the Trading Company.

Evarts, Choate, Sherman & Léon [Joseph H. Choate, Jr., of counsel; John B. Butler, Jr., with him on the brief], for the appellant Raw Silk Trading Company.

McManus, Ernst & Ernst [Irving L. Ernst of counsel], for the appellants Mortimer B. Foster and Isabel Price Foster.

Steckler & Weitzner [David Steckler of counsel], for the respondent.

MARTIN, J.:

On the 21st day of October, 1919, plaintiff entered into an agreement with the Raw Silk Trading Company, hereinafter called the Trading Company, by which plaintiff agreed to buy and the Trading Company agreed to sell 250 bales of China silk. The agreement contained the following provisions: " Each delivery made under this contract to be considered as a separate sale. * * * Price and Terms: at $8.65 per lb., 4 months less 1%. Settlement within 30 days by cash or trade acceptance. Quantity: Two Hundred Fifty (250) bales. Delivery: On arrival of shipment from Canton during March/April/May/June/July in about equal quantities."

The same day the Trading Company entered into an agreement with T. E. Griffith, Ltd., of Canton, China, by which the Trading Company agreed to buy and T. E. Griffith, Ltd., agreed to sell 300 bales of raw silk similar to that purchased by plaintiff from the Trading Company.

To pay for the 100 bales of silk so purchased the Trading Company, on April 2, 1920, and on May 21, 1920, applied to the defendant bank for two irrevocable letters of credit in favor of T. E. Griffith, Ltd., each for the sum of 10,500 pounds sterling, and it issued two such letters of credit to T. E. Griffith, Ltd., on April 6, 1920, and May 21, 1920, respectively. To obtain these letters of credit the Trading Company executed two customer's agreements by which it agreed to furnish the bank with banker's demand bills of exchange not later than twelve business days before the maturity of the respective acceptances, or to pay three business days before the maturity of the respective acceptances the equivalent thereof in New York city funds. The Trading Company also executed two loan agreements which gave the bank a lien on all the Trading

Company's property in its hands. Besides other collateral the bank at that time held 400 shares of Singer Manufacturing Company stock. Thereafter T. E. Griffith, Ltd., shipped 100 bales of silk and drew its drafts under the letters of credit for the sum of $72,167.68, which sum was paid by the defendant bank. Between July 1, 1920, and August 28, 1920, the bank delivered 100 bales of silk to the Trading Company under trust receipts in the usual form, retaining property in the silk in the bank and providing for the payment of the proceeds to the bank. Upon receipt of the silk the Trading Company delivered it to plaintiff under invoices which corresponded, as to dates, with the trust receipts. On the last five of these invoices, covering silk invoiced at sums totaling $28,042.88, it was stated: . " This silk received from Equitable Trust Co. 37 Wall Street, New York City, under trust receipt. Kindly remit enclosed trade acceptance duly signed to them."

Under dates of August 18, 19 and 20, 1920, the defendant bank wrote plaintiff requesting that the trade acceptances for silk delivered under four of the Trading Company's invoices be sent direct to the bank. The invoices mentioned in these letters were four of the five invoices containing the statement quoted above, and in amount they related to silk valued at $23,364.96. Plaintiff never delivered any trade acceptances for the 100 bales of silk, although it was required by its contract with the Trading Company to pay by cash or trade acceptances within thirty days. By August 31, 1920, plaintiff was in default for failure to give trade acceptances for 50 bales.

On October 19, 1920, after demand from and refusal by plaintiff to execute and deliver the trade acceptances which accompanied the invoices for the 100 bales of silk, the bank commenced an action against plaintiff. In the complaint it alleged payment of the drafts drawn by T. E. Griffith, Ltd., pursuant to the letters of credit established for the account of the Trading Company under trust receipts; that the contract dated October 21, 1919, was made between plaintiff herein and the Trading Company; that the 100 bales of silk were delivered to plaintiff by the Trading Company as trustee acting for the bank and delivering its property under the authority conferred by the trust receipts; and that at the time of such delivery invoices covering the purchase price of the silk and trade acceptances maturing at four months were presented to plaintiff herein to be accepted by it in case it should exercise its option of delivering trade acceptances instead of paying cash under its contract of October 21, 1919, with the Trading Company. The defendant in that action is the plaintiff in this action.

The complaint further alleges that " Each of the aforesaid bales

of raw silk delivered to defendant by said Raw Silk Trading Co. as hereinabove in paragraph XVII hereof set forth, was so delivered pursuant to and in due fulfillment of the terms of the aforesaid contract dated October 21, 1919, between said Raw Silk Trading Co. and defendant (Exhibit No. 19) and at the time of the delivery of each of the said bales of raw silk to defendant as hereinabove in paragraph XVII hereof set forth, defendant well knew that such bales of raw silk respectively were the property of plaintiff and were delivered to defendant by said Raw Silk Trading Co., acting as trustee and agent for plaintiff, and defendant thereupon became obligated to pay to plaintiff the purchase price of said bales of raw silk in accordance with the terms of the aforesaid contract dated October 21, 1919.   *   *   *

" Plaintiff has demanded of defendant payment of the purchase price of the bales of raw silk delivered to defendant as aforesaid, in cash or by delivery of trade acceptances in accordance with the terms of said contract dated October 21, 1919 (Exhibit No. 19), but no part of said purchase price has been paid, either in cash or by delivery of trade acceptances."

The complaint demanded judgment for the sum of $93,553.98. A verdict was directed in favor of the bank and against the plaintiff herein for the sum of $76,154.34, this being the amount advanced by the bank under the letters of credit.

Thereafter the plaintiff paid the bank $36,000 pursuant to an agreement whereby the bank accepted that amount in full satisfaction of all claims it had against the plaintiff herein; and the bank agreed to apply that sum on the debt owing it by the Trading Company for its advances in connection with the 100 bales of silk. Plaintiff and the Trading Company agreed that the payment of $36,000 should reduce the claim of $93,553.98 which the Trading Company had against the plaintiff for the purchase price of 100 bales of silk delivered under the contract of October 21, 1919, to the sum of $57,553.98, it being provided that nothing contained in the agreement was to affect the right of the Trading Company to assert in any legal proceedings a claim to the extent of $57,553.98 and interest. This agreement was approved by the creditors committee of the Trading Company. By that agreement 375 shares of Singer Manufacturing Company stock in the possession of the bank were set aside for the benefit of the plaintiff in the event that the court, in this action, should hold that plaintiff herein had any rights in or with respect to the stock.

The Trading Company on or about July 15, 1920, and thereafter, was financially embarrassed, and on August 31, 1920, a committee of its creditors, acting as liquidating trustees, took

charge of its business for the benefit of its creditors and stock-holders. On the last-mentioned date the Trading Company was insolvent and was indebted to numerous secured and unsecured creditors in excess of $1,000,000, and its assets were insufficient to pay its unsecured general creditors.

Prior to August 31, 1920, the plaintiff had sold and delivered silk to the Trading Company, for which it was, on August 31, 1920, indebted to plaintiff in at least the sum of $96,146.89.

Plaintiff alleges that, by the payment of the sum of $36,000 to the bank for goods it actually received from the bank, it is in equity and good conscience entitled to be subrogated to the rights of the bank and the Trading Company in the 375 shares of stock in the bank's possession; and it prays that the stock be sold under the direction of the court so that $36,000 may be paid to plaintiff out of the proceeds.

It is averred in the second amended complaint that the judgment granted the trust company went on " the ground that title to the merchandise delivered by the Trading Company was in the bank." It is also alleged that subject to the rights of the bank the Trading Company was the sole equitable owner of the merchandise.

The court at Trial Term took the following view: That there was a balance of $3,000 in plaintiff's favor on the various accounts between plaintiff and the Trading Company, the total in plaintiff's favor being at least $96,000, and the total in favor of the Trading Company being some $93,000; that accordingly plaintiff had a valid set-off against the Trading Company when the bank sued on October 20, 1920; that in insolvency plaintiff could assert such set-off (Debtor and Creditor Law, § 13, as added by Laws of 1914, chap. 360); that the intervention of the bank by its action and recovery of judgment against plaintiff had the effect of depriving it of its set-off, which would have resulted in plaintiff having nothing to pay the insolvent's estate as there would be a difference in plaintiff's favor; that loss to plaintiff of the $36,000 paid to settle the judgment can be averted at the expense of the Trading Company by subrogating plaintiff to the extent of $36,000, with interest and costs, to the bank's rights in the collateral deposited with it by the Trading Company; and the plaintiff has become equitably entitled to such subrogation because " In equity and good conscience Raw Silk Trading Co. should itself have paid the trust company. Instead it compelled plaintiff, its own creditor, to increase by $36,000 the debt to itself and to reduce correspondingly Raw Silk Trading Co.'s debt to the Trust Company."

We think there can be no such set-off. In the brief filed for

2

plaintiff it is conceded that no right to subrogation could arise for plaintiff's benefit by payment of its own debt. (*Schreyer* v. *Saunders*, 39 App. Div. 8, 10; *People ex rel. McMillan* v. *Supervisors*, 136 N. Y. 281.)

In *Fera* v. *Wickham* (135 N. Y. 223) Judge GRAY enunciated the principles governing the doctrine of equitable set-off as follows: " I think the principle to which we should adhere is this: When a party asks to have set-off against a demand upon him held by an assignee for the benefit of creditors, a claim against the insolvent estate, it will be allowed, provided his was a claim upon the estate due when the assignment was made; upon the ground that, by reason of the existence of cross-demands at the time of the assignment, which were due (or might have become due at the creditor's election), an equitable adjustment by set-off is made without interfering with the equities of others. But after the estate has passed to an assignee upon a trust to hold for and to distribute among creditors, the former and natural equity disappears in superior equities vesting in the general body of creditors. They are then interested in having equality of distribution, and if a creditor who, when the assignment was made, had no right to any offset, may be allowed it afterwards, he gains a preference. By the intervention of the rights of third persons, under the assignment, the equities change with the change in the situation of the original parties; to the misfortune of the creditor holding the demand against the insolvent estate, but, nevertheless, in accordance with equitable principles, as I deduce them from the decisions."

We are unable to perceive that plaintiff did anything but pay a valid obligation when it paid the bank the $36,000 under the settlement. It was bound to pay under the law, for it owed the bank that amount.

In *Spire* v. *Spire* (104 Kans. 501) the court (at p. 503) said: " It is elementary that subrogation is indulged only in favor of one who pays the debt of another, or one who pays to protect his own rights, and not in favor of one who discharges a debt for which he was himself originally and primarily liable. In 37 Cyc., at page 374, the general rule is stated as follows:

" ' Subrogation is allowed only in favor of one who, under some duty or compulsion, legal or moral, pays the debt of another; and not in favor of him who pays a debt in performance of his own covenants; for the right of subrogation never follows an actual primary liability, and there can be no right of subrogation in one whose duty it is to pay, or in one claiming under him against one who is secondarily liable, or not liable at all. In such cases payment is extinguishment.' "

For plaintiff it is argued that it was paying the debt of the Trading Company because the title of the bank was " a security title." But plaintiff was paying for the goods it bought, paying its own obligation. That is none the less true because the bank took plaintiff's obligation to secure repayment of advances, made on account of the Trading Company to pay the seller for the goods, or because the bank never sought to enforce plaintiff's obligation in an amount greater than such advances.

In the opinion of the trial judge reference is made to cases in which the person seeking subrogation paid a debt for which another was primarily liable or paid the obligation of another to protect a right or property of his own. Here plaintiff paid a debt for which it was primarily liable. It paid because it was so liable. That it was forced to pay the bank only emphasizes the fact that it was paying the price it had agreed to pay for the goods and its own obligation. Such obligation in no way ceased to be primarily its own because it had been assigned to secure the debt of the Trading Company to the bank, or because, in its origin, that debt happened to be connected with the purchase of the goods by the Trading Company, something with which plaintiff had no concern.

Accordingly, we are wholly unable to agree with the contention made for plaintiff that the judgment should be affirmed because " the essential consideration is that in paying the judgment the plaintiff was satisfying an obligation of the Trading Company, not its own."

Moreover, the rights of creditors of the Trading Company who are entitled to its assets have intervened; though such rights were wholly disregarded by the trial court.

We find no unjust enrichment of the estate of the insolvent as a result of plaintiff's paying $36,000 on the price of the goods, the legal title to which had been assigned to the bank before delivery to plaintiff. Plaintiff did not pay anything but its own debt by reason of the fact that the bank proceeded against it for the agreed price instead of applying the other collateral, the stock it had taken as security from defendant.

Plaintiff had absolutely no right to require the bank to first exhaust this other security. There is no suggestion that any part of the security had been given or taken, directly or indirectly, to protect plaintiff in any way whatever. The argument based on the statement that the securities were the principal fund has no support in the facts.

Nor can we agree with the trial justice when he indicates that the securities were pledged to secure payment of the " same debt." (122 Misc. 361.) Plaintiff's obligation was to pay the price of the

goods under its contract with the Trading Company the debt of which, on the other hand, was for advances which had been made to it by the pledgee. Because it had been transferred to the bank as security the debt due from plaintiff did not become other than an obligation due from it. It is beside the point to say that the Trading Company was indebted in other respects, either to plaintiff or the bank.

The agreement settling the judgment against plaintiff expressly left open the question whether plaintiff was entitled to subrogation as it now asserts, but it does not establish such a right.

Moreover, it is alleged that plaintiff paid the $36,000 involuntarily " in order to protect itself against distraint of and levy upon its property under execution upon said judgment." The payment was not made for an assignment of the rights of the bank. It is further alleged that when plaintiff paid the bank an assignment of the stock was refused. The rights of the creditors were evidently in the minds of all because by that time the transfer to the trustees for creditors had taken place.

References are made in the briefs to *Foreign Trade Banking Corporation* v. *Gerseta Corporation* (237 N. Y. 265), and to *Gerseta Corporation* v. *Gramatan National Bank* (205 App. Div. 868). We are unable to see that they have the slightest bearing on the questions involved on this appeal.

The defendant Foster asserts a claim to the Singer Manufacturing Company stock, subordinate only to the rights of the bank which has been paid in full. He made a contract with the Trading Company by the terms of which he turned over various securities to that company. This contract he now seeks to have reformed by inserting therein provisions to the effect that title to the securities or part thereof was reserved in him and that they were not to be transferred without his consent.

Foster does not contend that the pledge was not binding on him, but asserts that the pledgee has been paid and that no further claim is made by it. He contends that the agreement made with the Trading Company is ambiguous and conflicting upon its face. We find no such ambiguity. Furthermore, in considering the agreement it should be noted that it was prepared by the attorney representing Foster who appeared as a witness on the trial.

It effectuated an exchange of securities belonging to Foster for capital stock of the Trading Company. In addition, it was agreed therein that Mortimer B. Foster be employed at a salary of $12,000 per year for three years, and provided for the employment of others during a similar period. With reference to the exchange of securities for the capital stock of the Trading Company it

stipulated for the turning over of certain securities to the Trading Company at a specific valuation. It also arranged for a transfer of record of those securities, for all of which Foster received full value in addition to his employment at an agreed compensation.

Foster passed the legal title to the stock to make a profit for himself and to become a stockholder and officer of the Trading Company. Thereafter, the Raw Silk Trading Company's financial statement issued with the knowledge of Foster, carried the transferred securities as assets. The agreement and the conduct of Foster, as stated by the trial justice, do not justify his assertion that he continued to own the stock. We are, therefore, of the opinion that the claim of Foster is entirely without basis.

The judgment, therefore, except in so far as it dismisses the counterclaims of the defendants Foster, should be reversed, with costs to the defendant Raw Silk Trading Company, and the complaint dismissed, with costs to said defendant.

CLARKE, P. J., DOWLING, FINCH and BURR, JJ., concur.

Judgment except in so far as it dismisses the counterclaims of the defendants Foster reversed, with costs to the defendant Raw Silk Trading Company, and complaint dismissed, with costs to said defendant. Settle order on notice.